**UNITED STATES of America, ex rel. Robert J. MERENA, Plaintiff,**

v.

**SMITHKLINE BEECHAM CORPORATION, Smithkline Beecham Clinical Laboratories, Inc., Defendants.**

**United States of America, ex rel. Glenn Grossenbacher and Charles W. Robinson, Jr., Plaintiffs,**

v.

**Smithkline Beecham Clinical Laboratories, Inc., Defendant.**

**United States of America, ex rel. Kevin J. Spear, The Berkeley Community Civil Action Law Center, Jack Dowden, Plaintiffs,**

v.

**Smithkline Beecham Laboratories, Inc., Defendant.**

**Nos. CIV. A. 93–5974, CIV. A. 95–6953, CIV. A. 95–6551.**

United States District Court, E.D. Pennsylvania.

Aug. 31, 2000.

James E. Ward, Dept. of Justice, Civ. Div., Washington, DC, for U.S.

Marc S. Raspanti, David Laigaie, Miller Alfano & Raspanti, Philadelphia, PA, for Plaintiff Merena.

John Clark, Rand J. Riklin, San Antonio, TX, for Plaintiff Robinson & Grossenbacher.

Thomas H. Lee, Dechert, Price & Rhoads, Philadelphia, PA, for Defendant Smithkline Beecham Laboratories.

## OPINION AND ORDER

VanARTSDALEN, Senior District Judge.

The primary issue to be decided in the present proceeding is the amount, if any, that should be paid by the government to the qui tam relators in Civil Actions 93–5974 and 95–6953 [1]. On April 8, 1998, a

---

1. Civil Action 95–6551 was consolidated in this court with Civil Actions 93–5974 and 95–6953. The relators in Civil Action 95–6551 settled all of their qui tam claims with the government for an award of 15 percent of the principal sum of $13,279,125. This principal sum was the amount allocated by the government out of the total settlement proceeds for all separate claims that were asserted by the relators in Civil Action 95–6551. Those claims did not include and were separate and apart from the so-called "automated chemis-

final judgment, accompanied by an opinion, was awarded in favor of the relators in the sum of $42,312,802 in Civil actions 93–5974 and 95–6953. *United States ex rel. Merena v. SmithKline Beecham Corporation,* 52 F.Supp.2d 420 (E.D.Pa.1998). On appeal the United States Court of Appeals for the Third Circuit, reversed by an opinion filed on February 29, 2000, that was amended by an "Order Amending Slip Opinion" filed on April 21, 2000. A mandate was issued to the District Court on May 3, 2000. After a conference held with all interested counsel, it was agreed that all of the remaining issues to be decided on the remand should be resubmitted on briefs, without holding any additional evidentiary hearing. The parties were, however, free to utilize any of the materials previously entered into the record. The relators in their submissions have requested that the court make numerous additional findings of fact. Following the submission of briefs and answers and counter briefs, oral argument was held in open court on August 9, 2000. The transcript of that hearing was filed on or about August 22, 2000.

The case is now ripe for final resolution by the District Court in compliance with the guidelines provided by the Court of Appeals. The parties essentially agree as to the main issues to be decided by the district court on the remand. The amount to be paid to the qui tam plaintiffs (hereafter usually referred to as the relators) will in large part be dependent upon whether any relator was an "original source" of the information on which the allegations of the "automated chemistry" claims were based

that were included in the overall settlement negotiated between the government and the defendants. In my original decision I ruled that the separate claims asserted by the qui tam relators could not be allocated as to any dollar amounts out of the total settlement negotiated between the government and the defendants. The Court of Appeals concluded that "the relators' share of the proceeds must be based on a claim-by-claim analysis" and that my conclusion that there was "no evidence" upon which to determine the percentage of the settlement attributable to the automated chemistry claims was "clearly erroneous."

Fortunately, the parties now agree that the proper amount to be allocated to the "automated chemistry claims," including interest, should be $ 241,281,206. out of the total settlement of approximately $334,000,000, including interest, recovered by the government on behalf of itself and various governmental agencies and also on behalf of certain claims asserted by several state governments [2]. The "automated chemistry claims" remain in dispute as to whether any relator is entitled to any portion or share of those proceeds and, if so, the percentage of those proceeds that should be paid to any relator or relators.

The Court of Appeals also ruled that it was beyond dispute that the "relators' automated chemistry claims were 'based upon' a public disclosure" as defined in Section 3730(e)(4)(A) of the False Claims Act, 31 U.S.C. §§ 3729 et seq. and that *none of the relators could recover any of*

---

try claims" and the "Merena only non-automated chemistry claims" that are the principal foci of the issues remaining to be decided. The relators in Civil Action 95–6551 make no additional claim for a qui tam share in any of the remaining proceeds. All parties agreed to the settlement. The relators in Civil Action 95–6551 are no longer directly involved in this litigation. The parties have represented to the court throughout these proceedings that all of the relators in the above three civil actions have agreed among themselves as to how they will share in whatever qui tam award or awards are made in this proceeding.

2. The allocation of the proceeds, including interest, as to which there appears to be no dispute is as follows: $241,281,206 for the "automated chemistry" claims; $13,279,125 for the relators share in Civil Action 95–6551; $64,908,828 for the Merena non-automated chemistry claims; $14,507,107 paid to 42 states and the District of Columbia for claimed Medicaid losses; total—$333,976,266.

the settlement proceeds based on those claims "unless they qualify as original sources of information under section (e)(4)(B)." *United States ex rel. Merena v. SmithKline Beecham Corporation*, 205 F.3d 97, 107 (3d Cir.2000). Consequently the major issue for determination is whether any relator, and if so, which one or ones, was or were an "original source" or "original sources" of the information on which the allegations as to the automated chemistry claims were based. The automated chemistry claims, as agreed by the parties, constituted approximately $241,280,000 of the total amount of the settlement.

I conclude that relator Robert J. Merena was an "original source" who had, in the words of the statute (31 U.S.C. § 3730(e)(4)(B)) "direct and independent knowledge of the information on which the allegations [of the automated chemistry claims] were based" and that he "voluntarily provided the information to the Government before filing" the qui tram action. I further conclude that the relators in Civil Action 95–6953 (the Grossenbacher and Robinson relators) are barred from a qui tam share primarily because of the so-called "first to file" rule of 31 U.S.C. § 3730(b)(5) that provides "[w]hen a person brings an action under this subsection, no person other than the Government may intervene or *bring a related action based on the facts underlying the pending action*." [Underlining added].

The underlying question as to whether relator Robert J. Merena was an "original source" requires extensive analysis. Section 3730(e)(4) is the key section. It provides as follows:

(A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

(B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

There are relatively few circuit court cases that have focused squarely on whom or what is "an original source." In part, this may be due to the seemingly expansive interpretation that some courts, including the Third Circuit Court of Appeals, have given to the phrase and meaning of "an action ... based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media." Because of the interpretations that some courts have placed on the above quoted "based upon" section of the statute, it appears that in most litigated circumstances, where there has been a public disclosure of one of the specified types, qui tam relators have been foreclosed from receiving any share of the proceeds. Under some court decisions, government counsel could plausibly argue that no qui tam relator could ever recover a share in the proceeds when there has been a statutorily specified type of public disclosure that occurs before the filing of a qui tam action, or, alternatively, at least unless the relator was the source of the information bringing about the public disclosure. This appears to be the mainstay of the government's argument that the relators are entitled to no share in the automated chemistry claims.

Obviously, if that would follow, the Court of Appeals in this case, would have had no reason to remand for a determination of whether any relator was an "original source ... of the information on which

the allegations [of the automated chemistry claims] are based" (section 3730(e)(4)(B).) In the present case, clearly neither relator was a source, original nor otherwise, of any of the public disclosures that occurred before the filing of the respective qui tam actions; that is, the public disclosures of the government's ongoing investigation of the alleged fraudulent billing practices of the major national medical laboratories, including the SmithKline laboratories. Both the investigation and public disclosures about the investigation began after the successful prosecution and civil settlement of governmental claims of fraud against National Health Laboratories (NHL) in December of 1992. No relator has claimed credit for any of the public disclosures that occurred prior to the filing of the respective qui tam actions, and there is no evidence that any relator, prior to providing information to the government, was the source of, or made any public disclosure of the type that the Circuit Court concluded the qui tam actions were " based upon." [3]

The most recent case from the Third Circuit, prior to the instant case, was *United States, ex rel. Mistick v. Housing Authority of the City of Pittsburgh*, 186 F.3d 376 (3d Cir.1999). That case focused primarily on what constituted an action "based upon" the specified types of public disclosures; more specifically, whether a governmental response to a Freedom of Information Request is a public disclosure for purposes of interpreting the statute. The panel majority, after thoroughly reviewing the case law in the Third Circuit and the other Circuits concluded that:

> We thus hold that a qui tam action is "based upon" a qualifying disclosure if the disclosure sets out either the allegations advanced in the qui tam action or all of the essential elements of the qui tam action's claims.

*Id.* at 388. Becker, Chief Judge, in a thorough review of the existing case law, dissented. *Id.* 389–402.

The Court of Appeals in the case presently before the Court has unequivocally ruled that the allegations in the qui tam actions were "based upon" a public disclosure of the type specified in Section 3730(e)(4) by stating:

> It is beyond dispute that, under our circuit's interpretation of Section 3730(e)(4) in *Mistick*, 186 F.3d at 385–89, the relators' automated chemistry claims were "based upon" a public disclosure specified in that provision. *See* Joint App. at 1432–1441, 1442–1450, 1451–1457, 1470–1473; 1492–1498. As we explained above, relators who bring such a claim cannot recover unless they qualify as original sources of information under section (e)(4)(B).

Consequently, it is neither necessary nor appropriate for purposes of the present decision, to engage in any discussion of whether the allegations of the qui tam complaints of the relators, Merena and/ or Grossenbacher–Robinson, were based upon a prior public disclosure. I believe, however, that much of the difficulty in properly interpreting the "original source" exception stems from the interrelation between an action "based upon the public disclosure of allegations or transactions" and the alleged original source's "direct and independent knowledge of the information on which the allegations [presumably the allegations of the qui tam complaints filed in this case] are based." Also, under case law in this circuit and a majority of the Courts of Appeals, an action can be "based upon" a public disclosure, even though the relator does not rely upon or derive any information or in any way utilize a public disclosure in preparing the qui tam complaint or providing the requisite information to the government, and even if

---

3. At the hearing held on August 9, 2000, all parties, including the government, expressly agreed that there is no contention by any party that any relator provided any public disclosure or provided any of the information to any entity on which any public disclosure was made prior to the filing of any of the qui tam actions. See: Transcript of hearing, pages 183–184.

the relator is completely unaware of any prior public disclosure. See: e.g., *Mistick,* 186 F.3d 376, at 386 ("... the relator's independent knowledge of the [publicly disclosed] information is irrelevant.").

The critical issue, which must be decided in this case, depends upon a correct interpretation of the "original source" exception under subsection (B) of § 3730(e)(4).

In *Mistick* the panel majority determined that relator Mistick was not an "original source" because Mistick "did not have 'direct and independent knowledge' of the most critical elements of its claims; viz., that the Authority had made the alleged misrepresentations to HUD regarding its knowledge about Glid–Wall's unsuitability as a lead-based paint encapsulant at the time of the original specifications." *Id.* 388. The Court then cited from *United States ex rel. Stinson, et. al. v. Prudential Insurance Company,* 944 F.2d 1149, at 1160 (3d Cir.1991):

> [A] relator who would not have learned of the information absent public disclosure [does] not have "independent" information within the statutory definition of original source.

The *Stinson* panel (Scirica, dissenting) noted that the statutory definition of "original source" is "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action" *Id.* 1160.[4] The Court emphasized the significance of the conjunctive of "direct and independent" knowledge.

In this case, even though the Court of Appeals has ruled that under controlling case law, relators' qui tam actions were based upon publicly disclosed information, the record seems clear that the allegations contained in each of the relator's qui tam complaints, including all of the allegations as to the automated chemistry claims were prepared by the relators without reference to or reliance upon any public disclosure of any type or kind. Mr. Merena and Dr.

Robinson each had direct and independent knowledge of the information on which the allegations of their respective qui tam complaints were based, even though, as the Court of Appeals has ruled, "the relators' automated chemistry claims were 'based upon' a public disclosure". *United States ex rel. Merena v. SmithKline Beecham Corp., et. al.,* 205 F.3d 97, 107 (3d Cir. 2000). Clearly, under Table A that the Court of Appeals included in its decision, an "original source" is, under Section 3730(e)(4)(B), "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the government before filing" the qui tam action. Such a qui tam relator plaintiff qualifies as an original source under the statute, notwithstanding that the action is "based upon" a public disclosure.

Robert Merena, was a former employee of the defendant who had personal knowledge of the methods by which the defendant allegedly manipulated the billings to the government for various automated chemistry tests, by having series of laboratory tests that were ordered by doctors to be performed as a single series of tests later split apart into several laboratory tests and billed as separate tests for purposes of increasing the billings to various government agencies. Mr. Merena was what the cases and congressional history of the statute describe as the paradigmatic "original source," a "whistleblowing insider" employee. *Stinson,* 944 F.2d 1149 at 1161. So also was Dr. Charles Robinson, Jr., whose claims included splitting apart or unbundling certain tests from a standardized series of tests about which, at least as to some of the specific split billings, there may have been no prior public disclosures, either by the government or the news media, and some of the practices may have been unknown to the government at the time of relator's disclosure to the government.

---

4. Note that the Court imposed no requirement that the relator provide the information

before there is any public disclosure, as the government in this case contends is required.

The government does not contend or make any argument that either relator Robinson or Merena lacked direct and independent knowledge of the information on which their respective complaints were based. See transcript of hearing of August 9, 2000, page 187. The government's focus of its main argument that none of the relators can be an original source is founded on the proposition that "a relator must come forward with his 'voluntary disclosure to the government' *before* the public disclosure of the allegations and transactions involved in his complaint." *United States Brief on Remand,* page 26. The statute makes no such requirement by its direct wording. The statute merely requires that a relator, in order to qualify as an "original source", have direct and independent knowledge of the information on which the allegations are based and have "voluntarily provided the information to the Government before filing an action under this section." 31 U.S.C. § 3730(e)(4)(B). The statute by its express wording, at least, makes no other temporal requirement as to when the information must be provided to the government. Had the statute intended an additional requirement that the voluntary disclosure occur before there is any public disclosure, the statute could easily have so stated quite plainly and simply.[5]

The government makes no argument that the relators lacked direct and independent knowledge of the information on which the allegations in their respective qui tam actions are based or that they failed to provide that information to the government before filing their complaints. Instead, the government argues that statute has the additional requirement that the relators provide the information to the government before any public disclosure by any entity. The government contends that this requirement has been adopted by four Circuit Courts of Appeal.

The Second and the Ninth Circuit Courts of Appeal have specifically included a requirement that where there has been a public disclosure, the relator must be the source of the information to the entity that makes the public disclosure, in order to qualify under the "original source" exception. Those cases are: *United States ex rel. Dick v. Long Island Lighting Co.,* 912 F.2d 13 (2d Cir.1990) and *United States ex rel. Wang v. FMC Corp.,* 975 F.2d 1412 (9th Cir.1992). Those cases do not expressly require, as the government apparently contends, that relators provide the information to the government before there is a public disclosure. Rather, they require that the relator provide the information to the entity that makes the public disclosure.

The Sixth Circuit in *United States ex rel. McKenzie v. Bell South Telecommunications,* 123 F.3d 935 (6th Cir.1997), noted that the Circuit Courts of Appeal have taken several different approaches to the interpretation of the meaning of the term "original source" (*Id.* at 941). After reviewing the cases, the Sixth Circuit concluded "that, to become an original source, a relator must inform the government of the alleged fraud before the information has been publicly disclosed," but need not be the source of the publicly disclosed information. (*Id.* 942–943). The Court explained:

To qualify as an original source, the relator must have direct and independent knowledge of the information on which the publicly disclosed allegations are based. In addition, the relator must provide the government with the information prior to any public disclosure. There is no additional requirement that the relator be responsible for providing the information to the entity that publicly disclosed the allegation of fraud as long as the relator provides the informa-

---

**5.** As an example, the last phrase of subsection (A) of § 3730(e)(4) could have stated: "or the person bringing the action is an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided that information to the Government *before there is any public disclosure.*" Subsection (B) would then have become unnecessary and superfluous.

tion to the government prior to any public disclosure.

*Id.* at 943. In effect the Sixth Circuit rule would preclude a relator from any qui tam award if the relator brings suit after there has been a public disclosure, unless the relator provides the information to the government before there has been any public disclosure by any entity.

The District of Columbia Circuit held in *United States ex rel. Findley v. FPC–Boron Employees' Club,* 105 F.3d 675 (D.C.Cir.1997), *cert. denied,* 522 U.S. 865, 118 S.Ct. 172, 139 L.Ed.2d 114 (1997) that if a relator learns of fraud from a public disclosure, the relator cannot have independent knowledge of the information on which the allegations are based, and therefore cannot be an "original source." That court further held that the information must be provided to the government by the "original source"-relator prior to any public disclosure, but the relator need not be the party providing the information to the entity that makes the public disclosure. *Id.* at 690.

The Fourth Circuit Court of Appeals has flatly rejected the Second and Ninth Circuits' interpretation that the relator must be the party that provides the information to the entity that makes the public disclosure to qualify as an original source. *United States ex rel. Siller v. Becton Dickinson & Co.,* 21 F.3d 1339 (4th Cir.1994), *cert. denied,* 513 U.S. 928, 115 S.Ct. 316, 130 L.Ed.2d 278 (1994). The Fourth Circuit stated:

> We reject the Second Circuit's standard ... as imposing an additional, extra-textual requirement that was not intended by Congress ... [S]ection 3730(e)(4) ... unambiguously does not require, as the Second Circuit has held that it does, that a relator be a source to the original disclosing entity in order to be an "original source". Rather it requires only that the relator have direct and independent knowledge of the information underlying the allegations of a false claim and voluntarily provide the

information to the government before filing his qui tam action.

*Id.* at 1351. In *Siller,* the Court further specifically opined that the Ninth Circuit, in adopting the Second Circuit's holding had misread the statute's legislative history.

The Seventh Circuit in *United States ex rel. Mathews v. Bank of Farmington,* 166 F.3d 853 at 865 (7th Cir.1999) disagreed with the Ninth Circuit's determination in *Wang, 975 F.2d at 1418* that to be an original source, the relator "have ... a hand in the public disclosure of allegations that are a part of one's suit." The Seventh Circuit ruled that an "original source" must be someone who learns of the allegations or transaction independently of the public disclosure, but need not be the source of the public disclosure.

Most of the Appellate Courts appear to have rejected any requirement that where there has been a public disclosure, the relator must have been the source of the public disclosure; e.g., the Fourth Circuit in *Siller,* the Sixth Circuit in *McKenzie,* the Seventh Circuit in *Mathews,* the Eleventh Circuit in *United States ex rel. Cooper v. Blue Cross and Blue Shield of Florida, Inc.,* 19 F.3d 562, at 567, fn. 13 (11th Cir.1994) and the District of Columbia Circuit in *Findley.* However, some of these same circuits that have interpreted the Act's express requirement that the relator "voluntarily provide the information to the government before filing the qui tam complaint," have added an additional temporal requirement that the information be provided to the government before there is any public disclosure, at least where the relator was not the source of the public disclosure. See: *Findley* (District of Columbia Circuit) and *McKenzie* (Sixth Circuit).

Many, if not most, of the Courts that have required the relator either to be the source of the public disclosure and/or provide the information on which the qui tam complaint is based to the government before any public disclosure, do so on their

understanding of what they believe Congress would have wanted or on some rationale as to what would best serve the purposes of the statute. Where, however, a statute is specific, it seems to me that the interpretation of the statute should be judged on what the statute states, not what some jurists may think the statute ought to have said.

Although it may be superfluous to describe in any detail why and how the relators, Mr. Merena and Dr. Robinson each had direct and independent knowledge of the allegations on which their respective qui tam actions were based, a very brief review of their respective employment backgrounds with SmithKline may be appropriate.

In June of 1986 Mr. Merena was hired by SmithKline as the supervisor of Third Party Billing for SmithKline's National Billing System, which processed more than three-quarters of all claims that Smith-Kline presented to Medicare through Pennsylvania Blue Shield, Medicare's designated Medicare carrier. In such position he had access to and obtained detailed information and knowledge of SmithKline's billing, coding and claims processing procedures nationwide. After approximately one year in his original job with Smith-Kline he became Supervisor of third-party Cash Applications, supervising a clerical staff of thirty employees. Thereafter he was promoted to Supervisor of Response Development, a job that apparently supervised all receipts of payments from Medicare and other payers. His job was primarily as a financial systems analyst. He traveled to all of the 27 laboratory sites, and was familiar with all of the computer systems and data entry procedures utilized by SmithKline laboratories. He was familiar with the computer system and the data entry procedures known as Maxi Log, as well as the computer system known as TopLab used at various SmithKline Laboratories. He also became fully knowledgeable of the other central billing system used by six regional laboratories known as ARII that operated out of Nashville, Tennessee. There was one other central bill-ing system used by SmithKline known as the "Stars System," primarily utilized by the New Orleans SmithKline laboratory, although intended for later, wider use. Mr. Merena had full knowledge of all of these billing and coding systems. He was also privy to correspondence between SmithKline and its carrier, Pennsylvania Blue Shield as to certain billing practices. He was intimately familiar with the manner in which SmithKline's National Billing System personnel were able to expand group tests and codes so as to bill for individual tests separated from the group tests in order, allegedly, to maximize improperly the revenues received from the government. He was familiar with most, if not all, of the employees of SmithKline whose jobs were to prepare forms for billing purposes including those employees who were charged with the duty of analyzing regulations and governmental and carrier payment practices in order to obtain the maximum payments for laboratory tests. He continued to work for Smith-Kline for approximately one and a half years after filing his qui tam action on November 12, 1993. During that time he cooperated fully with the government's investigation of SmithKline and continued to obtain additional useful information for the government.

A review of the record shows clearly that all of Mr. Merena's allegations in the qui tam action that he filed were based upon his personal knowledge obtained as an employee and upon his own investigation of SmithKline's billing practices, entirely independent of any public or other disclosures preceding the preparation and filing of the complaint. Also it is clear that Mr. Merena provided all of the specific information contained in his complaint to the government prior to filing the complaint; including delivering a complete copy of the complaint several days before the complaint was filed, subsequent to several long prior conferences and meetings with government attorneys providing the government with the substantive details and specifics of his complaint. All of the

information provided to the government was purely voluntary on his part. The government agrees that the information he provided was accurate, reliable and useful.

Relator, Dr. Robinson is a pathologist. He was the medical director of Smith-Kline's regional laboratory in San Antonio, Texas from 1990 to 1993. He concluded, based upon his personal knowledge obtained in his duties as the medical director that SmithKline was overcharging the government for automated blood tests, by having the doctors order from a "profile form" prepared by SmithKline for a series of tests, including some tests that were medically either unnecessary and/or the doctors were unaware that SmithKline was billing the government for separate tests. He had direct and independent knowledge of all of the information on which the allegations in the qui tam complaint that he filed were based and he voluntarily provided that information to the government before filing the complaint. His knowledge extended beyond those practices in the San Antonio laboratories and included the corporate practices of Smith-Kline as to the forms, tests and billing practices.

Neither Mr. Merena nor Dr. Robinson relied upon, required or utilized any additional information from any outside source in order to prepare the allegations contained in their respective complaints. No critical or essential information necessary for the preparation of the relators' respective complaints was learned by either relator from sources other than their own knowledge and personal research obtained by them as employees of SmithKline. The relators had direct and independent knowledge of the information on which the "automated chemistry" allegations of the respective complaints were based, and they both voluntarily provided that information to the government before filing their separate qui tam complaints. They thus both fit squarely within the statutory requirements of an "original source" as defined in 31 U.S.C. § 3730(e)(4)(B).

■ I do not agree with the government's argument that a relator must "come forward with his 'voluntary disclosure to the government' *before* the public disclosure of the allegations and transactions involved in his complaint to qualify as an 'original source.'" (Underlining added). *See United States Brief on Remand, page 26*. As previously noted, had the statute intended this to be an additional requirement it could and should have so worded the statute. On the basis of the Court of Appeals decision, the allegations contained in the qui tam complaints were based upon a prior public disclosure; however, both relators were "original sources" who provided major information and assistance to the government as the government witnesses in this case repeatedly publicly asserted and testified.

The government argues in its brief on remand, page 31 that:

Individuals who provide their information to the government after that information has already been publicly disclosed, even when they obtained their information independently of the public disclosure, do little to assist the public in recovering monies lost due to fraud.

The facts of this case undoubtedly and overwhelmingly establish that the relators provided substantial assistance to the government, and hence the public, in recovering monies allegedly lost due to fraud, and thereby belie the assertions in the government's argument that because there had been prior public disclosure of the investigation, the relators did "little to assist the public . . ." (cited above).

If, in fact, because of a prior public disclosure, the information provided to the government by an otherwise properly qualified "original source," is of little assistance to the government, then the action would undoubtedly, in the wording of the statute, 31 U.S.C. § 3730(d)(1), be found "to be *based primarily* on disclosures of specific information (other than information provided by the person bringing the action . . . )" (underlining added) thereby

limiting the recovery to no more than ten percent under section 3730(d)(1). Such an award could be, at least in theory, a zero amount if the court concludes that no monetary award is appropriate "taking into account the significance of the information and the role of the person bringing the action in advancing the case to litigation." If a qui tam relator in such a scenario was found by the court to have contributed nothing of value, a zero award would appear to be appropriate.

The government's argument that the qui tam relator must voluntarily disclose his or her information to the government before there is any public disclosure of the information on which the action is based is entirely unnecessary to carry out fully the purposes of the statute, and to fairly compensate "whistleblowers" such as the relators in this case. Such an interpretation of the statute would definitely discourage insider-employees from reporting important and helpful additional information that the government, despite the public disclosures, may not have and might otherwise never acquire. The same may also be said as to those courts that have held that where there is a prior public disclosure, the qui tam relator must be the party providing the information to the disclosing entity. The legislative history, as reported in the cases, emphasized the intent of the statute to encourage true original "whistleblowers." If the government's present argument is accepted, whenever there is a public disclosure sufficient to make any later filed qui tam action an action "based upon" such prior public disclosure no potential "whistleblower", no matter how valuable his or her information might be to the government's investigation would be likely to come forward. If such a person did thereafter provide the government with new and/or additional information and file a qui tam action, according to the government's argument the relator could obtain no qui tam award.

I cannot accept such an interpretation of the statute. In summary, the statute by its express wording does not require that where there has been a prior public disclo-

sure, a qui tam relator is precluded unless (a) the relator voluntarily provides the information to the government prior to the public disclosure and/or (b) the relator provides the information to the entity that publicly disclosed the information. To impose such a requirement or requirements would be counterproductive. I conclude that both of the relators Robinson and Merena were "original sources" within the definition of the statute.

The next major issue is whether the relators Grossenbacher and Robinson, the relators in Civil Action 95–6953, are entitled to a qui tam share. Mr. Grossenbacher was the attorney for Dr. Robinson, and all of his information was acquired by reason of that attorney-client relationship. He did not have direct and independent knowledge of the information on which the allegations of the complaint were based. Originally he filed the action in the Western District of Texas in December 1993. Later, by leave of that court, Dr. Robinson was added as a relator after the government challenged Mr. Grossenbacher's right to maintain the action. Thereafter the case was transferred to this district and assigned as Civil Action 95–6953. In this court, the government continued its quest to seek the dismissal of the action on the basis of there being no proper qui tam plaintiff, and because the action was not the first to be filed.

Section 3730(b)(5) of the False Claims Act provides that when "a person brings an action under this subsection, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." This is the so-called "first to file" provision that expressly precludes subsequent actions based on the same underlying facts. In my original decision awarding a joint qui tam share to the relators in both the Merena and the Grossenbacher Robinson actions, I opined that it was unnecessary to decide the "first to file" issue because the relators had agreed among themselves as to the division of any award. Also, I inter-

preted at least some of the arguments to be that the claims of Mr. Merena and Dr. Robinson were not based upon the same underlying facts, and therefore both could possibly be entitled to a separate qui tam share.

The Third Circuit Court of Appeals held in *United States ex rel. Merena v. Smith-Kline Beecham Corporation*, 205 F.3d 97, at 107, (the present case):

> It is beyond dispute that, under our circuit's interpretation of Section 3730(e)(4) in *Mistick*, 186 F.3d at 385–89, the relators' automated chemistry claims were "based upon" a public disclosure specified in that provision.[6]

It is clear that, at least as to the automated chemistry claims that are under present consideration, the Court of Appeals ruled that both qui tam actions were based upon the same public disclosure or disclosures. Logically this means that the Grossenbacher-Robinson qui tam complaint is "a related action [to the Merena quit tam action] based on the same facts underlying ..." [the Merena action]. The Grossenbacher–Robinson qui tam action was originally filed in the Western District of Texas after the filing of the Merena complaint in the Eastern District of Pennsylvania and it cannot survive the bar of 31 U.S.C. § 3730(b)(5).

I recognize the argument by the Grossenbacher–Robinson relators, that the government by expressly withdrawing, on appeal, its claim of error on my failure to decide the "first to file" issue, waived that argument on remand. There might be some merit to this argument in most situations. However, footnote 11 in the opinion of the Court of Appeals stated:

> 11. We express no view as to whether the Court may properly award any recovery jointly to the pertinent relators, or whether it must specify each relator's award. Consideration of this issue would be premature until (a) it is determined under the correct legal standard

that a relator's award is appropriate and (b) the issue is properly brought before us by a party with standing. [Underlining added]

*Merena, Id.* 108. Also the Court of Appeals held that "a relator whose claim is subject to dismissal under section 3730(e)(4) [the public disclosure bar for qui tam relators who are not "original sources"] may not receive any share of the proceeds attributable to that claim." (The automated chemistry claims.) *Merena, id.* at 106. In consideration of that footnote, and the above quote from the opinion, I deem it appropriate, and probably necessary, to decide whether the Grossenbacher–Robinson parties may share in any portion of the settlement funds as qui tam relators.

I have held that Dr. Robinson was an "original source" and hence not automatically barred by section 3730(e)(4). The "first to file" rule must be considered. Relators seem to continue to argue that the "first to file rule" is a jurisdictional bar and that the government waived its right to raise that issue in this proceeding. The government argues, in part, that jurisdiction may not be waived. The Court of Appeals, stated in *Merena*, 205 F.3d 97, at 103:

> Thus, if a relator who is not an "original source" asserts a claim based upon one of the types of public disclosure specified in this provision and the government does not intervene, the claim must be dismissed, and the relator obviously receives no award. The provision does not expressly address the question whether such a relator is entitled to an award if the government intervenes before the relator's claim is dismissed— although it certainly counsels in favor of skepticism about a relator's ability to get an award under those circumstances. [Footnote not included].

Earlier in the same opinion, the Court at page 103 said:

6. Note that the Court of Appeals used the plural "relators' automated chemistry claims" and the singular when ruling that "the rela-

tors automated chemistry claims were 'based upon a public disclosure ...'" [Underlining added].

We do not agree with the parties that the relators' right to a share of the automated chemistry proceeds turns on a question of subject matter jurisdiction. Suppose that the government is right that the District Court should have dismissed the relators with respect to the automated chemistry claims. It would not necessarily follow that the relators could not be awarded a share of the automated chemistry proceeds. Congress may enact a statute providing for the payment of a reward or bounty to a nonparty who assists the government's enforcement efforts. See, e.g., 15 U.S.C. § 78u–1. Similarly, suppose that the relators are right that the government's intervention cured any prior jurisdictional defect and that the District Court properly refused to dismiss the relators as parties with respect to the automated chemistry claims. It would not necessarily follow that the relators are entitled to a share of the proceeds. Clearly, Congress need not provide for such relators to obtain a portion of the proceeds just because they remain parties. [Footnote not included]

The relevant question is not one of jurisdiction, but simply whether the qui tam statute authorizes an award when a relator asserts a claim that is subject to dismissal under § 3170(e)(4) [sic] but the government intervenes before the claim is dismissed.

■ I did not decide the "first to file rule" in my earlier opinion nor did the Court of Appeals expressly rule on the issue. It seems to me, however, that the Court of Appeals has at least suggested that a complaint that would be subject to dismissal under the "first to file rule" cannot recover a qui tam share, even if the claim is not dismissed before the government intervenes. In respect to the public disclosure "jurisdictional" bar of section 3730(e)(4) the Court of Appeals, as above noted, expressed "skepticism" as to the right of a qui tam relator to receive an award in an analogous situation. I recognize that the Court of Appeals was considering the effect of the "public disclosure bar" of section 3730(e)(4) rather than the "first to file rule" of 31 U.S.C. § 3730(b)(5). However, I see no basis for distinguishing between the results whether under the "public disclosure bar" or the "first to file" rule. I conclude that the "first to file" rule bars the relators Grossenbacher and Robinson from any qui tam award or share to the proceeds.

In *United States ex rel. LaCorte v. SmithKline Beecham Clinical Laboratories, Inc.*, 149 F.3d 227, 232 (3d Cir.1998) (a case related to the present actions) the Third Circuit Court of Appeals ruled, in affirming the dismissal of other qui tam relators in this litigation that:

> ... the phrase "related action based on the facts underlying the pending action," clearly bars claims arising from events that are already the subject of existing suits.

In the same opinion the Court of Appeals noted that a later filed case need not rest on the identical facts or precisely the same facts or details as the earlier claim. Since the Court of Appeals has already ruled in this case that both actions were based upon a prior public disclosure as to the automated chemistry claims, I think it is inevitable that both actions, as to the automated chemistry claims are based on the same underlying facts and both cannot simultaneously be maintained. The Merena complaint was first filed on November 12, 1993, and the Grossenbacher complaint (later amended to include Dr. Robinson) was first filed December 15, 1993. Although both complaints were later amended, the allegations as to the automated chemistry claims remained essentially the same and were based on the same underlying facts. Thus, even though the details may have varied and the later filed action may have been more specific as to its automated chemistry claims it was not the first to file [7].

---

7. It is somewhat academic whether the Grossenbacher Robinson qui tam action should be

dismissed at this point in the litigation for

For purposes of deciding this issue it is immaterial which relator first contacted and/or provided substantive information to the government about the facts of the claim. As Judge Scirica noted in his extensive dissent in *United States ex rel. Stinson, et. al. v. The Prudential Insurance Company,* 944 F.2d 1149, at 1176, fn. 5, section 3730(b)(5) "creates a potential 'race to the courthouse' among eligible relators, but such a race may also spur the prompt reporting of fraud." Consequently, although both Mr. Merena and Dr. Robinson were "original sources" as to the automated chemistry claims, only relator Merena is entitled to a qui tam award.

■ The next issue is whether Mr. Merena fits within the fifteen to twenty-five per cent category or the "no more than ten percent category". There are very few cases that have discussed the circumstances that define which of the two categories should be utilized in determining the amount of a relator's share. The statute provides, in relevant part:

If the Government proceeds with an action brought by a person under subsection (b), such person shall, subject to the second sentence of this paragraph, receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action. Where the action is one which the court finds to be based primarily on disclosures of specific information (other than information provided by the person bringing the action) relating to allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Governmental Accounting Office report, hearing, audit, or investigation, or from the news media, the court may award such sums as it considers appropriate, but in no case more than 10

percent of the proceeds, taking into account the significance of the information and the role of the person bringing the action in advancing the case to litigation. Any payment to a person under the first or second sentence of this paragraph shall be made from the proceeds.

31 U.S.C. § 3730(d)(1).

In Table A, the Court of Appeals in its decision in this case outlined three types of cases in which the 15% to 25% range of recovery is permissible:

1. relator brings an action that is not "based upon" publicly disclosed information.

2. "original source" brings an action that is "based upon" but not "primarily based" on publicly disclosed information.

3. "original source" brings an action that is "primarily based" on publicly disclosed information, but the "original source" provided the information.

*Merena,* 205 F.3d 97, 105. It is readily apparent that Merena could qualify for this range of recovery, if at all, only under subsection 2 above. The Court of Appeals in its decision expressly held that the relator's action was "based upon" publicly disclosed information. (205 F.3d 97, 107), thus eliminating category 1. As I have previously noted, the publicly disclosed information that the Court of Appeals concluded the qui tam complaint was "based upon" was clearly not provided by Mr. Merena. The governmental investigation of SmithKline was at least in the preparation stages and the basic areas of inquiry were known to the government through its investigation and prosecution of the action against NHL before Mr. Merena's first attempt to contact any government officials. Clearly the information that generated the news reports that preceded the filing of the present qui tam complaint, was not provided by Mr. Merena. Therefore subsection 3 above is inapplicable.

lack of jurisdiction or whether those qui tam relators should simply be barred from being awarded any qui tam share of the proceeds. The practical effect seems to be the same. No award will be made to the Grossenbacher-

Robinson relators, nor will the information, contributions and assistance provided by those relators be considered in determining the qui tam share to be awarded to relator Merena.

This leaves only subsection 2 as a possible basis for a 15 to 25 percent recovery. The unanswered question in this category is whether the Merena qui tam action in this case, although "based upon" publicly disclosed information was, in addition, "primarily based" upon such publicly disclosed information. Even if, however, the qui tam action that Mr. Merena filed, was "primarily based" on publicly disclosed information that he did not provide, as an "original source", (as I have found he was), he would still be entitled to a share of no more than ten percent of the proceeds of the settlement attributed to the automated chemistry claims "taking into account the significance of the information and the role of the person [Mr. Merena] bringing the action [the automated chemistry claims] in advancing the case to litigation."

The relators and the government are poles apart as to whether the automated chemistry claims for which SmithKline settled were "primarily based" on publicly disclosed information or whether they were merely "based upon" the publicly disclosed information. Because of what I, at least, believe is a very broad interpretation of what constitutes an action based upon a public disclosure, even though the allegations contained in the Merena qui tam action were based on Mr. Merena's direct and independent knowledge which he acquired as an employee of SmithKline and in which he in no way relied on any prior public disclosures, it is nevertheless very difficult to conclude that the action (the automated chemistry claims) was other than one which was primarily based on the prior public disclosures. Under the definition of "based upon" in *Mistick*, 186 F.3d 376, at 388, the public disclosures involved had to set out either the allegations advanced in the qui tam action or all of the essential elements of the qui tam action's claims (i.e. the Merena automated chemistry claims). Although the prior public disclosures may have lacked sufficient details to establish, solely on the basis of those prior public disclosures, a valid false claims act violation by Smith-Kline, it seems to me that the automated chemistry claims were primarily based on the essential elements of the automated chemistry claims provided by the public disclosures, accepting, as I must, the Third Circuit's definition of "based upon."

The statute itself does very little to attempt to define when an action is, in the words of the statute, "based primarily on disclosures of specific information (other than information provided by the person bringing the action)". The full relevant wording of the statute has been quoted above on page 26 of this opinion. Case law is likewise of little help. The Court of Appeals in the present case noted the remarks of Senator Grassley reported in 132 Cong. Rec. 228589 (1986) in explaining his understanding of the ten percent limit:

> In other words a ten percent cap is placed on those "original sources" who bring cases based on information already publicly disclosed where only an insignificant amount of that information stemmed from that original source.

The Court of Appeals also noted Representative Berman's comments in 132 Cong. Rec. 29322 (1986):

> The only exception to [the] minimum 15% recovery is in the case where the information has already been disclosed and the person qualifies as an "original source" but where the essential elements of the case were provided the government or news media by someone other than the qui tam plaintiff.

The Court of Appeals opined that "The lesser range (up to 10% of the proceeds) is provided for the (presumably unusual) cases, in which an 'original source' relator asserts a claim that is 'primarily based' on information that has been publicly disclosed and that the relator did not provide." *Merena* 205 F.3d 97, 105.

Typical of the difference between the parties as to a proper interpretation of the statute in relation to any qui tam award for the automated chemistry claims, the government takes the position that no award at all is appropriate, or if there is any award it must be in the zero to ten

percent range and a very low percentage within that range because the information provided by Mr. Merena was of insignificant use to the government. Mr. Merena, on the other hand, suggests that the ten per cent cap is applicable only in rare cases and where the relator provides an insignificant amount of useful information. He contends that the "original source" information that he provided, even if found not qualified for the fifteen to twenty-five per cent range, was certainly of substantial aid and assistance to the government and was significant and he played a vital and important role in advancing the case to a final settlement. I agree.

I do not think that it is necessary to review again the very valuable work and assistance that Mr. Merena provided to the government, in helping to bring about a favorable settlement for the government (claimed by the government to be the largest civil "false claims act" recovery up to the date of the settlement). That assistance is set forth in some detail in my original opinion, and I incorporate those portions of the prior opinion as if reiterated in this opinion. That opinion is now reported as *United States ex rel Merena v. SmithKline Beecham Corp.*, 52 F.Supp.2d 420, (E.D.Pa., 1998). Pages 442 through 448 of the reported opinion outline some of the assistance provided by Mr. Merena, although it does not carefully delineate between the work he did on the automated chemistry claims as separate from the other claims. Mr. Merena's undisputed testimony, which I accept as factually correct, was that most of the work and the many hours he spent assisting in the investigation involved the "automated chemistry" claims.

I think it is a very close question whether the automated chemistry claims set forth in the Merena qui tam complaint were "based primarily" on prior public disclosures that he did not provide or merely "based upon" such disclosures, within the definition of *Mistick*. To determine whether the action was "based primarily" on prior public disclosures, it would seem that the contribution by Mr. Merena to the total information on which the automated chemistry claims relied in bringing about a settlement of those claims must be compared against the prior publicly disclosed specific information relating to those claims. The government refers to this as the degree and extent of the "overlap" of the facts that were publicly disclosed and the allegations of the qui tam complaint. Where one is comparing Mr. Merena's contribution to that of the government, the party contributing more than the other would appear, under the commonly understood meaning of the word, to be "primary".

It is clear from the evidence, including the public news media articles and presentations that were introduced into the evidence, that, at whatever date Mr. Merena first communicated with and disclosed substantive information to the government, by that time, the government had started its broad ranged investigation of the billing practices and, more particularly, the allegedly improper billing for automated chemistry tests, against most of the national medical testing laboratories, specifically including SmithKline. After the successful NHL settlement, that included the same type of automated chemistry claims asserted against SmithKline in this action, the government was vigorously continuing its investigation. It seems clear that the government would have proceeded and would have eventually sought a monetary recovery from SmithKline for allegedly obtaining payments from the government by fraud, even if Mr. Merena had not come forward with his information and assistance. The government already had a great deal of generalized information about the widespread practices of the major national medical laboratories in splitting apart test profiles and then billing separately for certain of those tests, which was the heart of the false claims allegations[8]. Certainly, even without Mr. Merena's help,

8. *The government now makes the assertion that the "heart" of the false claims allegations*

*is that SmithKline deliberately misled physi-*

the government, through its LabScam investigations, subpoenas, and the successful recovery in the NHL investigation, already had all of the necessary and essential information to proceed on its own. The Court of Appeals determined that under the rule of *Mistick, supra.* at 388, the qui tam complaints were "based upon" the public disclosures that set out "either the allegations advanced in the qui tam action or all of the essential elements of the qui tam action's claim." However, at the time Mr. Merena first produced substantive information to the government, by its own admission the government then had insufficient facts to file a valid complaint.

On the other hand, I think that it is quite reasonable to conclude that without Mr. Merena's assistance and very valuable information, and the critical fact that he, a SmithKline employee with substantial inside knowledge of the corporate billing practices, filed the qui tam action when he did, brought about a much earlier and larger recovery for the government than if the government had to "go it alone." It is to a large extent speculative what the end result would have been without Mr. Merena's help. This however does not establish whether the action, as to the automated chemistry claims, was, or was not, primarily based on Mr. Merena's disclosures of specific information. Under the Court of Appeals definition of "based upon", the prior public disclosure or disclosures had to set out "either the allegations advanced in the qui tam action or all of the essential elements of the qui tam action's [the "automated chemistry"] claims. *Mistick, id.* at 388. By definition, therefore, it would seem that the government had all of the essential and necessary information from the prior public disclosures, and also had, as the government argues, the tools available to obtain all the details; e.g. through subpoenas and witness interviews. I conclude that the automated chemistry claims were based primarily on prior public disclosures of the type specified in 31 U.S.C. § 3730(d)(1) [9]. Consequently the award to Mr. Merena on the automated chemistry claims will be limited by the ten per cent maximum range.

One of the great difficulties in deciding the present issues is that there never was any judicial determination that SmithKline committed any fraud or did anything illegal. All parties to the present proceeding assume that SmithKline intentionally and fraudulently over-billed the various governmental agencies that paid SmithKline for the automated chemistry tests. The settlement, as in most civil settlements, admits of no wrong-doing on the part of the settling parties. Had the case gone to trial, it is far from certain that the government would have been successful in establishing that the automated chemistry claims constituted violations of the false claims act [10] or that there would have been

cians by preparing pre-printed series of laboratory test form orders for physicians to use that included tests that were medically unnecessary and that the physicians were unaware were being ordered by them and, more importantly, that the physicians were unaware that SmithKline, in order to increase revenues, would then separate the tests and bill the government for them as separate tests. The government claims that this was a "marketing scheme" rather than a "billing scheme" and that Mr. Merena was unaware of this so-called "marketing scheme." I think that it is at least doubtful that intentionally misleading the physicians in this manner would constitute a violation of the false claims act, even if such practices were proved. Intentionally over-billing the government would, of course, constitute a violation of the Act and evidence that SmithKline delib-

erately misled the physicians would undoubtedly be admissible at trial. However, over billing would certainly be the "heart" of any false claims act violations.

9. I recognize that in my prior opinion I stated that "I decline to make such a finding"; i.e., that the action was "based primarily on disclosures of specific information ..." relating to allegations of the type specified in section 3730(d)(1). *Merena*, 52 F.Supp.2d 420, 442. At that time I was considering all of the claims as a whole. Under the Court of Appeals decision that was obviously erroneous.

10. SmithKline has always maintained that its billings and billing practices with the government and governmental agencies were legal and proper under the respective applicable statutes and governmental regulations and

a substantial, or even any, recovery for the government. During the various proceedings in this and the related cases, SmithKline articulated several defenses that may well have been successful. This is not relevant to the issue whether Mr. Merena was an "original source" entitled to an award between fifteen and twenty-five percent of the proceeds or whether, in the words of section 3730(d)(1) "the action is one which the court finds to be based primarily on disclosures of specific information (other than information provided by the person bringing the action) relating to allegations or transactions ..." of specified types of public disclosures, thereby limiting an award to a maximum of ten percent of the proceeds. However, the part played by Mr. Merena does have importance in determining the percentage, up to the ten percent limit to which he is entitled. The statute states that where the ten per cent cap is applicable, as I find in the present case, the court shall award such sums as the court considers *appropriate* "taking into account the significance of the information and the role of the person bringing the action in advancing the case to litigation" That statutory standard is, at best, very indefinite.

As I have previously noted the government could and probably would have proceeded with the action without Mr. Merena's cooperation and assistance. However, what the amount of such a recovery, if any, would have been and when it would have been achieved is a best mere speculation. As an example, there is nothing to show what the effect, if any, the disclosure that Mr. Merena was the qui tam plaintiff, who SmithKline knew had a great deal of inside information and knowledge of its billing practices, may have had on SmithKLine's negotiating position.

Both Ms. Lam and Mr. Freedman, the two principal government prosecutors involved in the NHL prosecution and in organizing the so-called LabScam investigation, and who contend they were primarily responsible for the prosecution of guidelines. Those issues have, of course, nev-

the automated chemistry claims against SmithKline testified that at the time they issued the extensive subpoena to SmithKline on August 24, 1993, they had insufficient information to then proceed against SmithKline. There is no doubt that the assistance provided by Mr. Merena, starting around early October, 1993, helped considerably in advancing the strength and timing of the government's automated chemistry claims against SmithKline. In the prior opinion accompanying the judgement entered April 8, 1998 (reversed), as previously noted, I detailed some of the assistance provided by Mr. Merena, as set forth in *United States ex rel. Merena v. SmithKline Beecham Corp.*, 52 F.Supp.2d 420, at 442–448. Those statements should be considered as findings applicable to the present issues.

This is an unusual case. The assistance provided by Mr. Merena throughout the entire litigation was extensive and substantial. This is equally applicable to his assistance with the automated chemistry claims, which apparently required the most research and investigation by both the government and Mr. Merena. I think it is a very close question as to whether the automated chemistry claims were "based primarily" on prior public specified disclosures (thereby limiting the award to no more than ten percent), or whether Mr. Merena is entitled to an award of fifteen per cent to twenty-five percent, depending on the extent to which he substantially contributed to the prosecution of the action. The spread between the ten per cent maximum and the fifteen per cent minimum appears to be purely arbitrary. In my prior opinion I awarded a total of 17 per cent on the total recovery and the relators ask the same percentage be now awarded on the automated chemistry claims. I would find a seventeen percent award reasonable, if the fifteen to twenty-five percent range applied. However, because I have determined that the automated chemistry claims were "primarily based" on prior public disclosures that er been litigated by the parties to this action.

were not provided by Mr. Merena (or any other relator), the award is limited to ten per cent.

This is probably not the type of case that the framers of the most recent amendments to the statute contemplated would entitle a qui tam relator to no more than the ten percent limit. Senator Grassley whose observations on the statute were noted by the Court of Appeals in Merena, 205 F.3d 97, at 106: "In other words a 10 percent cap is placed on those 'original sources' who bring cases based on information already publicly disclosed where <u>only an insignificant amount of that information stemmed from that original source</u>." (Underlining added). Clearly the information supplied by Mr. Merena was far more than "insignificant". Also, the Court of Appeals noted, id. at 105 that the fifteen to twenty-five percent range is reserved for "most relators who qualify as 'original sources'..." and that the ten percent range is for "the presumably unusual cases."

I think it is difficult to conceive of any case where an "original source" who is entitled to no more than ten per cent of the proceeds, could have been of greater help. I recognize that the government's present litigation stance is that Mr. Merena helped very little and merely provided basically clerical assistance that the government could have obtained without him. In view of the many public accolades previously given him by the same government officials responsible for the prosecution of the case, I have trouble accepting or even rationalizing the government's present position other than attributing it to an overzealous attempt to lower the amount of the award rightfully due. *See: Merena*, 52 F.Supp.2d 420, at 450–451.

The maximum award of ten per cent should probably be awarded sparingly. Taking into account the significance of the information provided by Mr. Merena as to the automated chemistry claims and his role in advancing the case to litigation (specifically including only the automated chemistry claims), that ended in a settlement that all parties agree was an outstanding success for the government, I consider that a maximum award of ten percent of the proceeds of the automated chemistry claims is appropriate and will be awarded. It would be difficult to conceive of any case, wherein the recovery under the statute is limited to the ten per cent maximum, that would be more deserving of the maximum award. The limitation is applicable in this case because, although Mr. Merena was an "original source" I have determined that the action is "based primarily on disclosures of specific information" relating to the allegations of the automated chemistry claims. His assistance was substantial, the information he provided was significant and he played an important role in bringing the qui tam action and in advancing the case to litigation and settlement. I conclude that he should be awarded a ten percent qui tam share of the automated chemistry claims. Mr. Merena will be awarded ten per cent of the automated chemistry claims. This award amounts to the sum of $24,128,-120.60.

■ This is not the end of the inquiry. The government previously conceded that Mr. Merena had six claims that were separate from the automated chemistry claims. The government valued those claims for settlement purposes with SmithKline at $64,908,828. The government agreed that a proper award to Mr. Merena for these six so-called non LabScam claims should be in the fifteen to twenty-five percent range, and offered as a qui tam award for these claims sixteen percent of the sum recovered. After some additional litigation on the issue, I entered judgement against the government in favor of Mr. Merena for the minimum amount of fifteen per cent, being the sum of $9,736,324.[11]

11. I have been advised by the parties, that the government has paid Mr. Merena $11,034,501 calculated on the basis of paying 17% of the principal sum recovered by the government for the Merena only non-automated chemistry claims. That amount will be credited against the total award made in this case.

That was simply by way of partial judgement. The eventual judgement that I directed to be entered was on the basis of seventeen per cent of the total recovery by the government on all of the claims without allocation between or among claims. The Court of Appeals held this was error and directed that the awards must be based on a claim by claim basis. Therefore, it seems to me that I still must decide what award to make for those six non-automated chemistry claims (designated by the government as the Merena only, non LabScam claims), for which the government conceded liability.

In my original decision to award seventeen per cent of the total award to the relators jointly, I took into consideration, (although I may not have articulated this in the accompanying opinion), that Mr. Merena contributed far more to those non-automated chemistry claims than to the automated chemistry claims. Although there is very little evidence on this issue, the government conceded that the award should be in excess of the fifteen per cent minimum. It is quite possible that those claims might never have been presented to SmithKline by the government, but for the claims that Mr. Merena asserted in his qui tam action. As to those non-automated chemistry claims, which the government apparently concedes were not publicly disclosed prior to the filing of the Merena qui tam action, I am of the opinion that a substantially greater recovery than fifteen per cent is appropriate. As to the non-automated chemistry claims made by Mr. Merena for which the government settled with SmithKline for the sum of $64,908,-828, I conclude that Mr. Merena contributed substantially and provided most of the information utilized in the successful prosecution and settlement of those claims. Again, it is largely a judgment call as to what percentage should be awarded. Obviously, the government had the right that it exercised to intervene and take over the prosecution of the claims and to negotiate the settlement of them. This fact should not diminish Mr. Merena's substantial contribution to the prosecution of those claims

nor reduce the percentage of the quit tam award to which he is entitled. I recognize that it is primarily the obligation of the relator to establish the extent of relator's contributions, but I find that there is in the record sufficient evidence to establish his entitlement to a share well in excess of fifteen percent. My ultimate determination on this issue is that the award for the non automated chemistry claims asserted by Mr. Merena, for which the government settled with SmithKline for the sum of $64,908,828 should be twenty percent of the recovery, or the sum of $12,981,765.60. The parties agree, as set forth in footnote 11 above, that Mr. Merena has been paid by the government the sum of $ 11,034,-501, leaving a balance due on the Merena only, non-automated chemistry claims of $1,947,264.60. This sum will be added to the award of $24,128,120.60 for the automated chemistry claims, making the total judgment to be entered of $26,075,385.20.

This case has been vigorously litigated by all parties. The False Claims Act 31 U.S.C. § 3729 et seq. has spawned a great amount of litigation throughout the United States. There are serious disputes among and within the judicial circuits who have confronted the issues raised by the statute as to the proper interpretation of various clauses of the statute. Within the Third Circuit there have been several extensive dissents by members of the Court of Appeals panels. There seems to be no unanimity both among and within individual circuits as to when claims are "based upon" public disclosures, what constitutes a public disclosure, when and under what circumstances a qui tam relator must first inform the government of the claims, the extent of the factual information that must be provided to the government prior to filing the qui tam action, when a qui tam action must be filed where there has been a public disclosure, what are the requisites to be classified as an "original source," when a claim is "primarily based upon" prior public disclosures and many other issues that arise under the statute. These questions will continue to plague and per-

plex litigants and the courts. I believe that the number of qui tam actions will steadily increase as more and more programs become funded by federal money. Quite obviously, corporations and individuals entitled to payments from federal funds will try, legitimately, to increase the amount of payments receivable from the government and thus increase profits. The many regulations and procedures for handling and processing claims from governmentally sponsored programs will become increasingly complex and uncertain as to what payments may properly be claimed. This will undoubtedly give rise to more and more claims for payment from the government under questionable circumstances. No doubt the number of qui tam cases that will be filed under the False Claims Act will increase. Indeed, one of the principal purposes of the most recent amendments to the Act was to encourage meritorious qui tam actions.

I hope that the Third Circuit Court of Appeals will see fit, at the next opportunity, to review the False Claims Act, *in banc,* and answer at least some of the knotty questions that will continue to crop up. I also hope that the United States Supreme Court will take the first opportunity it has to review the several inter-circuit conflicts as to the law.[12] It is unfair to litigants, both the government, defendants and qui tam relators to be needlessly unsure of the applicable law. At the very least, because of inter-circuit conflicts as to interpretation of the statute, it forces litigants and litigants' attorneys, wherever possible, to attempt to choose the most favorable jurisdiction; i.e. "forum shop." This should not have to occur when actions are filed under a federal statute that should be applied and interpreted uniformly throughout the land.

Judgment will be entered in favor of Mr. Merena, the qui tam relator plaintiff, in the sum of $26,075,267.20.

All factual statements and all legal conclusions contained in this opinion shall be deemed findings of fact and conclusions of law, and all prior findings of fact and conclusions of law contained in the opinion filed on April 8,1988, not inconsistent with this opinion, shall also be deemed as additional findings of fact and conclusions of law.

### JUDGMENT

AND NOW, this 31st day of August, 2000, for the reasons set forth in the accompanying opinion, it is hereby

ORDERED as follows:

1. In Civil Action No. 93–5974, judgment is entered in favor of the relator ROBERT J. MERENA and against the UNITED STATES OF AMERICA in the sum of $26,075,267.20.

2. In Civil Action No. 95–6953, judgment is entered in favor of the UNITED STATES OF AMERICA and against the relators GLENN GROSSENBACHER and CHARLES W. ROBINSON.

---

**12.** *Vermont Agency of Natural Resources v. U.S. ex rel. Stevens,* 529 U.S. ——, 120 S.Ct. 1858, 146 L.Ed.2d 836 May 22, 2000 involved only the issue of the right of a private individual to maintain a qui tam action against a state governmental agency. That case does not appear to be relevant to any of the issues in this case.